COURT OF APPEALS
DECISION
DATED AND FILED

July 15, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP2044-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2016CF1070

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

DUSTIN E. HEWITT,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Eau Claire County: WILLIAM M. GABLER, SR., and JAMES M. ISAACSON, Judges. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Dustin Hewitt, pro se, appeals a judgment convicting him, following a jury trial, of one count of making a bomb scare and two counts of felony bail jumping, all as a repeater. He also appeals an order denying his postconviction motion without an evidentiary hearing.[1]

¶2 Hewitt argues that the circuit court erred by denying his postconviction motion without holding an evidentiary hearing because he sufficiently alleged the following claims: (1) the detective who investigated his offenses acted in reckless disregard for the truth, which resulted in search warrants that were not supported by probable cause; (2) the prosecutor's misconduct before and at trial violated Hewitt's constitutional due process rights; and (3) the circuit court violated Hewitt's right to a fair trial by improperly participating in his trial. We reject Hewitt's arguments and affirm.

## BACKGROUND

¶3 On September 22, 2016, the State charged Hewitt with one count of making a bomb scare, one count of making threats to injure or accuse of a crime, and two counts of felony bail jumping, all as a repeater. According to the criminal complaint, on August 8, 2016, a Department of Corrections ("DOC") agent received an email threatening to bomb the DOC office in Eau Claire. The email included a forwarded email from a July 19, 2016 bomb threat to the Ladysmith Police Department in Rusk County. On August 28, 2016, the same DOC agent received an email threatening to arrest or kidnap her son (because the son

---

[1] The Honorable William M. Gabler, Sr., presided over Hewitt's trial and entered the judgment of conviction. The Honorable James M. Isaacson entered the order denying Hewitt's postconviction motion.

allegedly sent a bomb threat) unless she paid $450,000 to the company GoDaddy.[2] Both emails were sent from the account "mbeizer.nicholas@gmail.com," which law enforcement had linked to Hewitt based on previous investigations of threatening emails sent to GoDaddy and the Rusk County courthouse.

¶4      In February 2018, Hewitt, represented by counsel, proceeded to a jury trial at which the DOC agent; two investigating detectives; Hewitt's brother; Nicholas Beizer, GoDaddy's deputy general counsel; and Hewitt's parents testified.  Hewitt did not testify.

¶5      The DOC agent testified that she had been Hewitt's probation agent and that she worked in the DOC office in Eau Claire.  She also testified that on August 8, 2016, at 12:20 a.m., and on August 28, 2016, at 4:03 a.m., she received the threatening emails noted above from the email account "mbeizer.nicholas@gmail.com," and she believed that Hewitt sent both emails.

¶6      Detective Jeff Nocchi testified about his investigation of the threatening emails, including who sent them.  Nocchi testified that he received a document from Google pursuant to a search warrant showing that a mobile device with a phone number that Nocchi identified as being associated with Hewitt was registered with Google on June 2, 2016.   Nocchi also identified "mbeizer.nicholas@gmail.com" as one of four email accounts associated with the

---

[2] At trial, the DOC agent clarified that the person named in the email was not the DOC agent's son, but her ex-fiancé.

device and Hewitt's phone number. Nocchi further testified that the IP address used when the email account was created was also assigned to Hewitt's device.[3]

¶7      Detective Nocchi also testified about a text message originating from Hewitt's device and sent to the phone number associated with Hewitt's brother on August 4, 2016, which read, "Those extreme XXL drinks u gave me taste like Pepto bismo, it like tingles your throat or some shit, dad and I r drinking one. Weird drinks!" Nocchi further stated that he downloaded the contents of Hewitt's brother's phone, that Hewitt's phone number was previously in Hewitt's brother's contact list and labeled as "him," and that the number had been deleted from the contact list. Hewitt's brother told Nocchi that the "him" on his contact list was Hewitt. During his testimony, Hewitt's brother confirmed that his phone number was the one that received the text message, that he had Hewitt's number saved as "him," and that he deleted Hewitt's number from his contacts.

¶8      Detective Donald Henning testified that he and Detective Nocchi interviewed Hewitt. Henning testified that Hewitt denied owning a cell phone and stated that the Ladysmith Police Department had hacked his email "and gained control of it."

¶9      Beizer testified that Hewitt participated in GoDaddy's reseller program. Beizer explained that if Hewitt referred a customer to GoDaddy to purchase a product, then Hewitt would receive a commission on the purchase made by the customer. Beizer also testified that Hewitt believed GoDaddy owed him a commission and that he became upset when GoDaddy denied the

---

[3] Detective Nocchi explained that an IP address is "a set of numbers that identifies a device on a network such as the internet."

commission. Beizer described the numerous emails and phone calls that GoDaddy received from Hewitt as "threatening in nature," and he stated that he referred those communications to law enforcement. Beizer further testified that he had never used the email account from which the threatening emails were sent.

¶10 Hewitt's mother testified that she did not recall receiving text messages from Hewitt in the summer of 2016, that she had not seen him with a phone during that time, that he had never said anything to her about bombing a DOC office, and that he had never said "derogatory things about a probation agent in Eau Claire." Hewitt's father testified that he lived with Hewitt, that he had not seen Hewitt use a phone in August 2016, that he had not received messages from the phone number associated with Hewitt, and that he had not seen documents about bomb threats in Hewitt's room.

¶11 The jury found Hewitt guilty of making a bomb scare and the two felony bail jumping counts. The jury was unable to reach a unanimous verdict on the count of making threats to injure or accuse of a crime, and the circuit court declared a mistrial on that count. The court subsequently dismissed that count on the State's motion. For the three other counts, the court imposed sentences totaling four and one-half years of initial confinement followed by five years of extended supervision.

¶12 Hewitt, now pro se, sought postconviction relief, raising nine claims: (1) law enforcement's search warrant affidavits were not supported by probable cause and were based on false information; (2) Hewitt was falsely imprisoned; (3) the prosecutor engaged in misconduct by obtaining a conviction through the use of false evidence and testimony and by misstating the evidence in his closing argument; (4) there was insufficient evidence to convict Hewitt because the circuit

court prejudiced the jury against him through the judge's "verbal and non-verbal cues" and because the evidence the State introduced should not have been admitted; (5) Hewitt was not present for the giving of jury instructions and closing arguments; (6) the jury instructions were improper because they allowed the jury to convict Hewitt "on a lower standard of proof than 'beyond a reasonable doubt'"; (7) the court erred by not dismissing the second felony bail jumping count because it was based on the dismissed count, which violated double jeopardy; (8) Hewitt was denied the right to counsel for his appeal; and (9) Hewitt was denied the right to challenge his convictions because of an incomplete and incorrect record.[4]

¶13    The circuit court rejected all nine claims and denied Hewitt's motion without holding an evidentiary hearing.  Hewitt appeals.  Additional facts will be provided below.

## DISCUSSION

¶14    On appeal, Hewitt argues that the circuit court erred by denying his postconviction motion without holding an evidentiary hearing.  As a threshold matter, we note that Hewitt also argues, in his reply brief, that our standard of review set forth in *State v. Allen*, 2004 WI 106, 274 Wis. 2d 568, 682 N.W.2d 433, is inapplicable to his case because he is not raising an ineffective assistance of counsel claim.  Hewitt is incorrect because although our supreme court in *Allen* noted that it was examining a postconviction motion alleging an ineffective

---

[4] On appeal, Hewitt does not raise the claims from his postconviction motion regarding the sufficiency of the evidence, the improper jury instructions, double jeopardy, the right to counsel for his appeal, or the incomplete and incorrect record.  Therefore, we do not address those claims further.

assistance of counsel claim, it "stress[ed] that the standard we announce today applies to other postconviction motions in which an evidentiary hearing is requested."[5] *Id.*, ¶13. Thus, the *Allen* standard is the applicable standard of review.

¶15 We review a circuit court's decision denying a postconviction motion without a hearing under a mixed standard of review. *See id.*, ¶9. Whether the defendant's motion "alleges sufficient material facts that, if true, would entitle the defendant to relief" is a question of law that we review de novo. *Id.* If the motion raises such facts, the court must hold an evidentiary hearing. *Id.* A postconviction motion satisfies this standard when it includes material "facts that 'allow the reviewing court to meaningfully assess [the defendant's] claim.'" *Id.*, ¶21 (alteration in original; citation omitted). In other words, the motion must "allege the five 'w's' and one 'h'; that is, who, what, where, when, why, and how." *Id.*, ¶23.

¶16 If the motion does not raise such facts, "or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the circuit court has the discretion to grant or deny a hearing." *Id.*, ¶9. We review a court's decision to grant or deny a hearing for an erroneous exercise of discretion. *Id.* A court's exercise of discretion is erroneous "if it is based on an error of fact or law." *State v. Ruffin*, 2022 WI 34, ¶28, 401 Wis. 2d 619, 974 N.W.2d 432.

---

[5] Our supreme court noted that the standard may not apply in all cases, such as plea withdrawal motions or "other types of motions where the movant has a right to a hearing." *State v. Allen*, 2004 WI 106, ¶13, 274 Wis. 2d 568, 682 N.W.2d 433. Hewitt's postconviction motion does not fall under either of those categories.

¶17    Hewitt's postconviction motion raises claims regarding the validity of the search warrants, the prosecutor's use of false testimony and other evidence before and at trial, and the circuit court's conduct during trial. For the following reasons, we conclude that the circuit court did not err by denying Hewitt's motion without holding an evidentiary hearing because his motion fails to raise sufficient material facts that entitle him to relief, makes only conclusory allegations, or the record conclusively shows that he is not entitled to relief.

## I. The Search Warrants

¶18    In his postconviction motion, Hewitt challenged the search warrants issued to six companies on the grounds that the affidavits filed in support of them lacked probable cause and that they were based on false information. Within those allegations, Hewitt claimed that Detective Nocchi acted with reckless disregard for the truth by failing to identify an informant and by stating "[b]are suspicions," "undated personal observations," and an "inadequate conclusion in each warrant based on inconclusive evidence with intent to reasonably mislead officials." Hewitt listed the facts from the affidavits that he believed were pertinent to his motion. Based on those facts, Hewitt argued that the warrants lacked probable cause because they did not include direct observations, there was "no rational thought or logic" to believe that several email accounts were being managed by the same person, the warrants did not include information from a previous police report that the detective consulted, there were no preservation requests sent to the

companies, and the detective generated fictitious account records for one of the companies.[6]

¶19    A search warrant may be based, among other things, "upon sworn complaint or affidavit" and "may issue only on probable cause." ***State v. Sveum***, 2010 WI 92, ¶¶23-24, 328 Wis. 2d 369, 787 N.W.2d 317 (citation omitted).  In order to issue a search warrant, a magistrate must "determine whether, under the totality of the circumstances, given all the facts and circumstances set forth in the affidavit, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  ***Id.***, ¶24 (citation omitted).  We agree with the circuit court that the search warrants here satisfied this standard because the affidavits presented "sufficient facts to support an honest belief" that someone conveyed a threat that was false and that person knew the information was false.[7]

¶20    The search warrant affidavits contained information that details Detective Nocchi's investigation of other threatening emails and messages that were made prior to the threatening emails in this case, including a police report regarding threats made to GoDaddy, to the Rusk County courthouse, and to the Ladysmith Police Department from multiple email accounts that were linked to

---

[6] Hewitt additionally alleged that in his interview with law enforcement, Detective Nocchi confirmed that the device from which the threatening emails were sent was not Hewitt's device.  Hewitt also makes this allegation on appeal.  Our review of Hewitt's interview with law enforcement shows that Nocchi was attempting to get Hewitt to tell him the location of the device, not confirming that the device was not Hewitt's.  Nocchi stated, "I'll agree it's not your phone," after beginning the statement with, "Let's put it this way, let's say it's not your phone, where is this phone?"

[7] The elements for making a bomb scare are (1) that the defendant intentionally conveyed or caused to be conveyed a threat or information "concerning an attempt or alleged attempt being made or to be made to destroy any property by the means of explosives," (2) that the threat or information was false, and (3) that the defendant knew the threat or information was false. *See* WIS. STAT. § 947.015 (2023-24); *see also* WIS JI—CRIMINAL 1920.

Hewitt. The affidavits also included information collected through subsequent search warrants for information related to those email accounts. On appeal, Hewitt argues that Nocchi's affidavits lacked probable cause demonstrating that evidence of a crime would be found at the searched companies because Nocchi did not provide the name of the person who informed him of the police report, omitted where and when he obtained the messages sent by the email accounts, omitted the fact that some accounts were traced to a different person,[8] and failed to state that he was acting in an official capacity during the investigation.

¶21 Neither Hewitt's postconviction motion nor his arguments on appeal explain why the absence of this information in the affidavits resulted in the warrants being issued without probable cause. Other than claiming that the information contained in the police report or the records that Detective Nocchi received pursuant to the search warrants is false, Hewitt does not explain why that information is unreliable and not credible, such that it would not support a probable cause determination. That the dates for the search warrants do not cover the dates of his offenses in this case is irrelevant because those warrants were also for information about email accounts used to make threatening emails, one of which was used to send threatening emails in this case.

¶22 For the same reason, Hewitt fails to show that Detective Nocchi acted in reckless disregard for the truth during his investigation. When challenging a search warrant on the ground that an affidavit contains false

---

[8] Hewitt cites to a Chippewa County criminal complaint in support of this argument, which stated that the IP address for one of the email accounts was traced to a different person. The investigating officer in that case later learned that the IP address was likely associated with a prepaid cell phone and stated that determining the owner of such a phone is more difficult.

information, a defendant must overcome a presumption of validity by showing that the challenged information is false and that the affiant provided the false information "with a reckless disregard for the truth." *State v. Anderson*, 138 Wis. 2d 451, 463, 406 N.W.2d 398 (1987). A reckless disregard for the truth means that "the affiant in fact entertained serious doubts as to the truth of the allegations or had obvious reasons to doubt the veracity of the allegations." *Id.* None of the facts to which Hewitt points show that Nocchi entertained doubts as to the truth of the information he provided or had any obvious reasons to doubt the veracity of the information he received.

¶23 In all, Hewitt's assertions that the search warrant affidavits contained incomplete and false information are insufficient to establish that the warrants were issued without probable cause or that Detective Nocchi acted in reckless disregard for the truth. The circuit court appropriately concluded that Hewitt failed to flesh out his claims regarding the search warrants. Therefore, the court did not err by denying Hewitt an evidentiary hearing on his claims regarding the validity of the search warrants.

## II. The Prosecutor's Conduct

¶24 Hewitt's postconviction motion next challenged the prosecutor's conduct at trial in various ways. Hewitt alleged that the prosecutor obtained a conviction through the use of false evidence because Hewitt was allegedly incarcerated between August 5 and August 10, 2016, he received an email from "mbeizer.nicholas@gmail.com" while he was incarcerated in October 2016, and the prosecutor altered and fabricated the exhibits used at trial. Hewitt also alleged that the prosecutor obtained a conviction through the use of false testimony from

Detective Nocchi, Detective Henning, and Beizer. Finally, Hewitt alleged that the prosecutor misstated evidence in his closing argument and in rebuttal.[9]

¶25 The circuit court concluded that Hewitt's postconviction motion failed to explain the relevance of his objection to the trial exhibits or how the exhibits prejudiced him. The court did not address the motion's remaining allegations because they were "conclusions and statements made without any supporting evidence that is relative to the guilt or innocence of the defendant." On appeal, Hewitt restates his allegations regarding the prosecutor's use of false evidence as a claim that the prosecutor's charging decision was based on that false evidence, and he adds that the prosecutor knew the search warrants did not cover the dates of the alleged offenses.

¶26 Hewitt's allegations regarding the prosecutor's use of false evidence either before or at trial are conclusory and are insufficient for any court to meaningfully address either claim. Hewitt's postconviction motion does not point to, and we cannot find, anything in the record (other than his motion) suggesting that he was incarcerated between August 5 and August 10, 2016, or that he

---

[9] Hewitt's postconviction motion also claimed that he was falsely imprisoned; however, he failed to complete his briefing on the issue. Noting this, the circuit court rejected the claim by choosing "not to speculate or complete [Hewitt's] argument." On appeal, Hewitt incorporates the false imprisonment claim into his arguments that the prosecutor committed misconduct and appears to argue that the delay between his arrest on September 15, 2016, and his initial appearance on September 22, 2016, was unreasonable. *See* WIS. STAT. § 970.01(1) (2023-24); *see also County of Riverside v. McLaughlin*, 500 U.S. 44, 56-57 (1991).

Hewitt's claim was undeveloped in the circuit court, and it is similarly undeveloped on appeal, given that he fails to argue or show that the delay caused him prejudice. *See State v. Golden*, 185 Wis. 2d 763, 769, 519 N.W.2d 659 (Ct. App. 1994) (concluding that the remedy for a *Riverside* violation is not the voiding of a subsequent conviction "unless the delay resulted from a deliberate *Riverside* violation producing prejudice to the defendant's ability to prepare a defense"). Hewitt's conclusory allegation that the delay violated constitutional due process and the Wisconsin Statutes is insufficient to entitle him to any relief on this basis.

received emails while he was incarcerated. Moreover, Hewitt fails to explain why the prosecutor's knowledge regarding the dates of the search warrants shows that the evidence from those warrants is false, and we have already noted that fact is irrelevant, given that the warrants included information for the email account used to send threatening emails in this case. Thus, Hewitt's claims regarding the prosecutor's use of false evidence are conclusory and fail to show that he is entitled to relief.

¶27 Hewitt's postconviction motion similarly fails to allege sufficient material facts showing that he is entitled to relief on his claim that the prosecutor used false testimony. Hewitt's motion alleged that Detective Nocchi's testimony established "forensic fraud" and showed that Nocchi deliberately falsified forensic evidence to obtain a conviction. Hewitt's motion did not explain what portion of Nocchi's testimony established the "forensic fraud" or why that false testimony affected his trial, and he fails to do so on appeal.

¶28 Hewitt's postconviction motion also alleged that Detective Henning's testimony was false because it contradicted what Hewitt told the detectives during his interview with law enforcement. On appeal, Hewitt explains that he never stated that the police department had hacked his email and that it was Henning who made this statement to Hewitt. The law enforcement interview, however, shows Hewitt told Henning that he provided his attorney with the password to his email, that his attorney changed the password, and that "the cops hacked it from her." Thus, Hewitt made the statement that Henning testified he made, just not exactly as it was said in the interview.

¶29 Hewitt's postconviction motion further alleged that Beizer's testimony was false because he said that Hewitt participated in GoDaddy's reseller

program and Beizer had previously told a detective that Hewitt was an "outside consultant." As the State notes, Hewitt fails to show that he was a consultant rather than a reseller. More importantly, Hewitt fails to explain why that difference matters or how it shows that the rest of Beizer's testimony was false. In sum, Hewitt's postconviction motion fails to show that he is entitled to relief on his claim that the prosecutor relied on Detective Nocchi's, Detective Henning's, and Beizer's allegedly false testimony.

¶30    Finally, Hewitt's postconviction motion fails to show that the prosecutor's alleged misstatements regarding trial evidence in his closing argument and in rebuttal rose to the level of infecting his trial with unfairness. We note that counsel is generally "allowed considerable latitude in closing argument." *See State v. Wolff*, 171 Wis. 2d 161, 167, 491 N.W.2d 498 (Ct. App. 1992). When a prosecutor's remarks are alleged to be improper, we determine "whether those remarks 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (citation omitted).

¶31    Hewitt's postconviction motion first challenged the following statement the prosecutor made during his closing argument regarding the text message that Hewitt sent to his brother:

> You heard his brother testify. That couldn't have been easy for him. He says, yeah, Dustin sent me that. And how do we know Dustin sent him that? The contact information was in the phone under him, he talked about drinking an energy drink, he talked about being with his father, and we know that he lived with his father.

Hewitt's motion appears to allege that the prosecutor misstated that the text message was about an energy drink because Hewitt's brother had testified that it was about a protein shake. Hewitt's brother testified that Hewitt sold energy

drinks through GoDaddy, that he received a text message from Hewitt regarding an "extreme XXL energy like protein shake," that the message mentioned Hewitt and his father were trying the drink, and that the energy drinks Hewitt sold were different from the "protein shake thing" talked about in the message. In his postconviction motion and on appeal, Hewitt fails to explain how the discrepancy between the energy drink and the protein shake shows that the prosecutor misstated the evidence or how the discrepancy rendered his trial unfair.

¶32     Hewitt's postconviction motion next challenged the prosecutor's rebuttal statement that Hewitt's counsel "indicated to you that all of the exhibit information, all the records predate the threats that were sent. That's not true. Recall the GoDaddy records, they went into August of 2016. That's a false statement." Hewitt argued that GoDaddy records were not in evidence and were never provided to law enforcement. While that may be true, Hewitt fails to explain how that misstatement rendered his trial unfair. Moreover, the circuit court informed the jury that counsel's remarks during closing arguments are not evidence and specifically instructed the jury that "if any of the remarks of the attorneys have suggested certain facts not in evidence, you should disregard any such suggestion." Jurors are presumed to have followed the court's instructions, *State v. LaCount*, 2008 WI 59, ¶23, 310 Wis. 2d 85, 750 N.W.2d 780, and Hewitt fails to show that the prosecutor's reference to records that were not part of the evidence, when compared to the records that were in evidence, rendered Hewitt's trial unfair.

¶33     Hewitt also challenged the prosecutor's following rebuttal statement:

> And my final point, members of the jury, is [Hewitt's counsel] told you no one saw him making these threats. Recall that the threat on August 8th is dated 12:20 a.m. The threat on August 28th is made at 4:03 a.m. Of course

> nobody saw him make those threats because no one was up at that time. He lived alone with his father and his father was sleeping.

In his postconviction motion, and on appeal, Hewitt contends that the above statement is false because no one testified to the times when anyone in his residence went to sleep, and whether anyone else lived with him and his father. In addition, Hewitt alleges that his uncle also lived with him and his father at the time of the offenses.

¶34  As the State explains, the prosecutor was not saying there was evidence that Hewitt's father was asleep at 12:20 and 4:03 a.m., but rather the prosecutor "was simply saying that it was unlikely that Hewitt's father would have seen Hewitt using the phone because Hewitt's father was likely not awake at such a late hour." Hewitt's father did testify that he lived with Hewitt, but he did not say that anyone else lived with them and Hewitt does not point to anything in the record that mentions his uncle living with them. Given that counsel has considerable latitude during closing argument, we see nothing improper in the prosecutor's statement.

¶35  In all, none of Hewitt's assertions regarding the prosecutor's filing of charges, the prosecutor's use of evidence and testimony, and the prosecutor's closing argument and rebuttal show any misconduct by the prosecutor, much less prejudicial misconduct. Thus, the circuit court did not err by denying Hewitt an evidentiary hearing on his claims regarding the prosecutor's conduct.

**III.  The Circuit Court's Conduct**

¶36  Hewitt's postconviction motion next claimed that the circuit court was prejudiced against him and that the judge prejudiced the jury against Hewitt

16

through "verbal and non-verbal cues." Among other things, Hewitt alleged that the court did not rule on his counsel's pretrial motions (including his motion in limine), it sent inadmissible exhibits to the jury, and the judge's "tone of voice with the jury at every stage and in general during the entire course of the trial was unusual." Hewitt also alleged that he was not present for the giving of jury instructions and closing arguments.

¶37     The circuit court denied Hewitt's claim, concluding that Hewitt's assertions were "accusations without substance or evidence supporting this claim" and that the transcripts showed Hewitt was present for the giving of jury instructions and closing arguments. On appeal, Hewitt restates these allegations to argue that the court participated in the prosecution, which rendered his trial unfair.

¶38     First, Hewitt argues that the circuit court failed to rule on his counsel's pretrial motions, that it had no good cause to defer ruling on those motions, and that the court's failure to rule on those motions resulted in the improper admission of evidence. Hewitt does not specify which pretrial motions he believes the court failed to rule on, but he points to a pretrial discussion of a motion in limine filed by Hewitt's counsel, which asked to limit the State from mentioning prior incidences and crimes. Hewitt's counsel also objected to the State's proposed exhibits and sought to limit the date range of those exhibits. The circuit court noted that it had not seen the proposed exhibits and that it was not prepared to rule on the admission of the exhibits.

¶39     The circuit court, however, did not fail to rule on the motions. Rather, the court stated that Hewitt's counsel could object to the exhibits during trial and the court would rule on the objections at that time. Hewitt fails to explain what evidence he believes was improperly admitted, but, based on his appellate

briefing, it appears he believes all of the trial exhibits were improperly admitted. He does not explain why he believes they were improperly admitted and, as noted above, his allegations that the exhibits contained false information are insufficient. Further, he fails to point to any objection made by his counsel to the admitted evidence during trial or any ruling by the court that he believes is erroneous. Therefore, he fails to show that he is entitled to relief in this regard.

¶40 Second, Hewitt argues that the circuit court erroneously ruled on which exhibits to send to the jury room because the ruling "was not reasonably supported by the facts of record" and instead "evidences the existence of prejudice caused by" the prosecutor's misconduct. As a result, Hewitt continues, the court's ruling allowed improper evidence to be sent for the jury to consider. The court discussed with the parties which exhibits to send to the jury, gave Hewitt and his counsel the chance to look through the exhibits it intended to send, listened to counsel's objections to four exhibits, and determined that the exhibits could go to the jury based on the trial testimony. Again, it appears Hewitt believes that none of the trial exhibits should have been sent to the jury, but he fails to allege why the court erred by sending those exhibits to the jury or how the court's alleged error affected the outcome of his trial.

¶41 Third, Hewitt argues that the circuit court judge directed the jury to return a guilty verdict at the start of voir dire because the judge "explained to the jury in a persistent cajolery tone of voice what they are expected to do in this particular case." Hewitt did not raise this issue in his postconviction motion, but even if he had, it fails. The judge did not tell the jury to find Hewitt guilty, but he simply explained to prospective jurors what "the jury is going to be expected to do in this particular case."

¶42 The circuit court judge told prospective jurors that the purpose of voir dire was to ensure "that we can start out with a fair and impartial jury, in other words, people that don't have any inclination one way or another, either in favor of the state or in favor of the defendant or against the state or against the defendant." The judge continued:

> So we all have a jury of people who can promise to be fair and impartial. And then based upon them listening to the evidence and seeing the evidence, and there's going to be both testimony and I'm assuming documentary evidence, so based upon the evidence that the jury is going to see and hear, based upon the jury instructions, that is, a statement of the law that I'll be giving to you in writing at the end of the case so you can see what the law is, so based upon the evidence that you see and hear, based upon the law that I will give you that you must follow and that you must accept, and then based upon your deliberations with your fellow jurors, you will determine whether the state has proven beyond a reasonable doubt whether Mr. Dustin Hewitt has committed one or more of these offenses. So that's what a jury is going to be required to do.

The judge then asked the prospective jurors whether they would be unable to serve as it had just explained. There is nothing in the judge's statements that even suggests he directed the jury to find Hewitt guilty.

¶43 Fourth, Hewitt argues that the circuit court improperly excluded him from the courtroom for the giving of jury instructions and for closing arguments.[10] Hewitt also contends that the court provided counsel with jury instructions that only had the subject titles and that counsel were allowed to object only to the

---

[10] Hewitt's postconviction motion cites a portion of the trial transcript in which the circuit court was determining whether a defendant needed to be present to decide which exhibits to send to the jury. The court ultimately decided Hewitt was required to be present. This determination occurred after the giving of jury instructions and after closing arguments.

subject titles and not the substance of the instructions. The record, however, shows that Hewitt is incorrect as to both claims.

¶44 At the start of the jury instruction conference, the circuit court noted that Hewitt and his attorney were present. Nothing in the transcript from that point through closing arguments suggests that Hewitt was not present in the courtroom. Hewitt does not point to anything in the transcript suggesting otherwise. The transcript also shows that the court stated it provided counsel with verdict forms and instructions, and it gave the parties a draft of the jury instructions it intended to give and the order in which it would give them.

¶45 In all, none of Hewitt's assertions regarding the circuit court's rulings on motions and exhibits, the circuit court judge's statements to jurors, or the court's purported exclusion of Hewitt from the courtroom show any prejudice by the court toward Hewitt. Therefore, the court did not err by denying Hewitt an evidentiary hearing on his claims regarding the court's conduct.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2023-24).